## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

          v.

WILLIAM H. EICHENGREEN and DAVID L.
MYATT,

                              Defendants.

FILED: SEP 29,2008
No. 08CV5564
JUDGE DOW
Hon. MAGISTRATE JUDGE ASHMAN
RCC

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission")

alleges as follows:

### NATURE OF THE COMPLAINT

1.      This case involves two related frauds relating to Directors Performance

Fund, LLC (the "Fund"), a hedge fund run by Sharon Vaughn and William Eichengreen.

First, in the Spring and Summer of 2005, David L. Myatt and Richard E. Warren – under

the auspices of a corporate shell called American Trade Industries, Inc. ("ATI") –

defrauded the Fund by convincing the Fund's investment adviser Directors Financial

Group, Ltd. ("DFG"), wholly-owned by Vaughn, to invest $25 million, almost all of the

Fund's assets, in a prime bank scheme (referred to herein as the "ATI Program").  In

marketing the fraudulent ATI Program, Myatt falsely claimed that the Program traded in

discounted fixed income instruments on a secret European market sponsored by the U.S.

Federal Reserve, generating a return of 10% per week with no risk to principal.  Second,

Eichengreen and DFG defrauded the Fund, and DFG's individual investor adviser clients

who invested in the Fund, by (a) falsifying the Fund's financial statements, thereby allowing DFG to take profit-based fees to which it was not entitled, and (b) consistently misrepresenting the Fund's trading strategy, investments, and performance.

## JURISDICTION

2.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v], Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa], Section 214 of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

## DEFENDANTS

3.      William H. Eichengreen, age 60, resides in Highland Park, Illinois.  In his 30-year career in the financial services industry, Eichengreen has been employed by a number of futures commission merchants, broker-dealers, and investment advisers. Eichengreen was Chief Compliance Officer and Marketing Director for both the Fund and DFG.  Eichengreen was employed by DFG from 1992 until June 2006.

4.      David L. Myatt, age 44, normally resides in Los Gatos, California but is currently incarcerated at the CI Taft Federal Correctional Institution in Taft, California. Myatt claimed to be the trustee for an organization called the Dalemy Trust and an associate with ATI.  On August 24, 2007, in the related criminal case U.S. v. Warren, et al., 05-CR-921 (N.D. Ill.), Myatt pled guilty to obstruction of justice in connection with his fraud against DFG.  On May 23, 2008, the Court sentenced Myatt to 16 months in prison.

## RELATED INDIVIDUALS AND ENTITIES

5.      Directors Financial Group, Ltd., an investment adviser that was registered

with the Commission from December 1, 1998 until the Commission revoked its

registration on June 6, 2006, was an Illinois corporation organized in 1992, with its

principal place of business in Lake Forest, Illinois.  DFG was the managing member of,

and investment adviser to, Directors Performance Fund, LLC.  In addition, DFG managed

accounts for over 230 individual investment adviser clients, several of whom also

invested in the Fund.  On March 2, 2006, the Commission sued DFG in connection with

this matter.  DFG subsequently settled all of the Commission's claims against it.

6.      Sharon E. Vaughn, age 63, resides in Lake Forest, Illinois.  Vaughn was

the President and sole owner of DFG, which Vaughn and Eichengreen ran out of an

office in Vaughn's home.  As DFG's President, Vaughn provided investment advice and

portfolio management services to high net worth individuals and managed the

investments of the Fund.  On March 2, 2006, the Commission sued Vaughn in connection

with this matter.  Vaughn subsequently settled all of the Commission's claims against

her.

7.      Directors Performance Fund, LLC, an Illinois limited liability company

formed in March 2002, was a hedge fund managed by DFG.  At its peak, in June 2005,

the Fund had 29 investors and over $28 million under management.  Several of DFG's

individual investment adviser clients were investors in the Fund.  The Fund is no longer

operational and its assets have been returned to investors.

8.      Richard E. Warren, age 66, is currently incarcerated at the Metropolitan

Correctional Center in Chicago, Illinois.  He was the owner and President of ATI.  On

November 20, 2007, the jury in U.S. v. Warren, et al. convicted Warren on 11 wire fraud

counts in connection with his fraud against DFG. On April 25, 2008, he was sentenced to

16.5 years in federal prison based on that conviction.

## FACTS

### Background of DFG and the Fund

9.      At all times relevant to this Complaint, DFG was registered as an

Investment Adviser pursuant to Section 203 of the Advisers Act.

10.      At all times relevant to this Complaint, Vaughn was DFG's President and

sole owner.

11.      At all times relevant to this Complaint, William Eichengreen was Chief

Compliance Officer for DFG.

12.      Vaughn and Eichengreen controlled DFG, which was run out of Vaughn's

home in Lake Forest, Illinois. DFG operated only through Vaughn and Eichengreen.

13.      By March 2002, DFG claimed to provide investment advice to over 230

high net-worth clients.

14.      In March 2002, DFG supplemented its investment advisory business by

creating a private hedge fund, Directors Performance Fund, L.L.C. DFG was the

managing member and investment adviser to the Fund.

15.      Eichengreen served as the Fund's Chief Compliance Officer and Chief

Marketing Officer. In those capacities, Eichengreen was responsible for (a) marketing

the Fund to potential investors, (b) making sure that the Fund complied with applicable

laws and regulations, and (c) working with the Fund's internal accountant to ensure that

monthly customer statements were accurate.

16.     Eichengreen was also involved in other major decisions for the Fund, including the selection of the Fund's investments.

17.     For managing the Fund, DFG was paid a monthly management fee of 1/6 of 1% of the Fund's net asset value, and a quarterly allocation of 20% of the "net new profits" earned by the Fund in that quarter.

### The Offering Memorandum

18.     To market the Fund, DFG and Eichengreen provided prospective investors with a copy of the Fund's Offering Memorandum (the "Memorandum").

19.     Eichengreen drafted the Memorandum, reviewed and approved its contents, and distributed it to prospective investors.

20.     From April 2003 through May 2005, Eichengreen and DFG created several versions of the Memorandum.  When a new version was created, Eichengreen and DFG distributed the new version to the Fund's existing investors as well as to prospective investors.

21.     From April 2003 through May 2005, Eichengreen and DFG distributed the Memorandum to over 100 prospective investors.  In that time period, several individuals invested in the Fund based, at least in part, on the representations in the Memorandum.

22.     Between April 2003 and May 2005, DFG and Eichengreen distributed the Memorandum to, among others, several of DFG's individual investment adviser clients. Several of those individual investment adviser clients ultimately invested in the Fund.

23.     The Memorandum emphasized that investors should rely on its contents in making their investment decisions, telling prospective investors "[y]ou must rely solely on the information set forth herein and your own independent analysis of the investment."

24.     The Memorandum explained that the Fund's overall investment objective was to "maximize total return . . . in a manner consistent with liquidity and conservation of capital."

25.     The Memorandum contained numerous misrepresentations regarding the Fund's trading strategy and permitted investments.

26.     Although several versions of the Memorandum were distributed from April 2003 to May 2005, the misrepresentations discussed in this Complaint were unchanged during that period.

27.     At all times relevant to this Complaint, the Memorandum represented that the Fund earned its returns by applying a "proprietary trading strategy" called the "Beta Strategy," that "combines proprietary trading systems and active investment management."  The Memorandum represented that "the Beta Strategy's investment methodology has produced consistent and impressive results over the past several years."

28.     From April 2003 to May 2005, the Memorandum disclosed that the Fund's Beta Strategy "generally involves purchasing, directly from issuers, dealers and institutional bond desks, government and other high-quality debt of various maturities, determined to present minimal credit risk."

29.     The Beta Strategy section defined "high quality debt securities" as securities either "rated in one of the two highest rating categories by Standard and Poor's . . ., Moody's Investors Service, Inc. . . . or any other Nationally Recognized Statistical Rating Organization" or "considered to be of comparable quality as determined by [DFG]."

30.     The Memorandum also stated that Vaughn would conduct, or at least oversee, the Fund's trading activity.  The Memorandum disclosed that, in the latter case, DFG would implement the Beta Strategy by "contractually engag[ing] the services of 1 or 2 experienced traders . . . [with] proven expertise and consistent success" in using the Beta Strategy's methods.

31.     In addition to stating the Fund's trading strategy, the Memorandum listed the permitted investments for the Fund, including:

- "Obligations issued or guaranteed by the U.S. and foreign governments," such as U.S. Treasury bills;

- "Obligations of U.S. and non-U.S. banks," such as certificates of deposit or interest bearing accounts;

- "Commercial paper and other short-term debt obligations of U.S. and foreign companies";

- "Medium or long-term corporate debt securities"; and

- "When-issued and delayed delivery (forward commitment) securities."

32.     DFG made only four significant investments on behalf of the Fund during the Fund's three-year existence: (a) a December 2003 investment in a currency trading program offered by Eclipse Trading, Ltd. ("Eclipse"); (b) a $9.6 million investment from June 2003 through November 2004 in a purported stock loan program operated by Argyll Equities, LLC ("Argyll"); (c) a $300,000 loan to Liberty International Entertainment, Inc. ("Liberty") that paid 30% annual interest; and (d) the $25 million investment in Warren's and Myatt's fraudulent ATI Program.

33.     None of those four investments fit within the scope of the Fund's "permitted investments" or the "Beta Strategy" as defined in the Memorandum and none of those investments are "high quality debt securities" as defined in the Memorandum.

34.     The Memorandum's representations about the Fund's "proprietary" "Beta Strategy" were false when made.  In reality:

(a)     DFG did not develop or have any ownership rights to the Beta Strategy.  Rather, DFG and Eichengreen copied the Beta Strategy language from the prospectus for another hedge fund that had no connection to DFG.  Neither Vaughn nor Eichengreen knew what the original Beta Strategy was;

(b)     DFG never implemented the Beta Strategy and never used the Beta Strategy to evaluate or select the Fund's investments.  In fact, none of the Fund's investments were consistent with the Beta Strategy;

(c)     the Beta Strategy was never used to produce "consistent and impressive results" for the Fund;

(d)     DFG never invested in "high quality debt securities" or any securities rated by a Nationally Recognized Statistical Rating Organization; and

(e)     DFG never performed any analysis of its investments to determine if they were of comparable quality to a security rated in one of the two highest rating categories of a Nationally Recognized Statistical Rating Organization.

35.     The Memorandum's representations regarding who would conduct and oversee the Fund's trading were also false when made.  In reality, Vaughn never conducted or oversaw trading on behalf of the Fund and the Fund never retained any trader with "proven expertise and consistent success" in using the Beta Strategy's methods.

36.     The Memorandum's representations about the Fund's "permitted investments" were also false when made.  In reality, none of the Fund's investments fit within the categories of "permitted investments" disclosed in the Memorandum.

37.     At the time he made the misrepresentations in the Memorandum, and at the time he distributed the Memorandum to investors, Eichengreen knew or recklessly disregarded the facts described in paragraphs 23 - 36.

38.     The misrepresentations contained in the Memorandum were material.  In making the decision to invest, a reasonable investor would find it important that (a) the Fund did not use (and had never used) the Beta Strategy, (b) the Fund had invested – and was investing – contrary to the Beta Strategy and the list of permitted investments, (c) the Fund's investments did not qualify as "high quality debt securities," and (d) Vaughn was not conducting or overseeing trading and had no experience in applying the Beta Strategy.

### Eichengreen's Oral Misrepresentations to Prospective Investors

39.     In addition to providing investors with the Offering Memorandum, Eichengreen made oral representations to prospective investors in marketing the Fund.

40.     During several meetings with prospective investors from April 2003 through May 2005, Eichengreen represented to investors that (a) the Fund earned its returns through the active trading of bonds, (b) Vaughn would conduct, or at least oversee, the bond trades, and (c) investors' principal would not be at risk and would remain in a "non-depletion account" at the Fund's bank.  DFG informed investors that their principal could not be "depleted" or moved from that account until withdrawn by the investor.

41.     At the time Eichengreen made those oral representations to investors and prospective investors, Eichengreen knew, or recklessly disregarded, that (a) the Fund had never earned, and had no plans to earn, returns through the active trading of bonds, (b) Vaughn was not conducting or overseeing any trading activity, (c) the Fund's investments could lose (and had previously lost) money, and (d) there was no "non-depletion account" and, in reality, DFG had removed assets from the Fund's accounts for each of the Fund's investments.

42.     Eichengreen's oral misrepresentations to prospective investors in the Fund – described in paragraph 40 – were material.  In deciding whether to invest, a reasonable investor would have found it important that (a) the Fund did not follow the trading strategy described by Eichengreen, (b) Vaughn was not conducting or overseeing any bond trading on behalf of the Fund, (c) an investment in the Fund could lose value, and (d) the Fund's assets did not reside in a "non-depletion account" at the Fund's bank.

## The Eclipse Currency Trading Scheme

43.     On December 22, 2003, DFG invested $700,000 of the Fund's assets (then about 13% of the Fund's total assets) in a purported currency trading program run by Eclipse Trading Ltd., a London-based company.

44.     The currency trading program did not fit within the Memorandum's list of permitted investments, did not meet the Memorandum's definition of a "high quality debt security," and there is no evidence that DFG applied the "Beta Strategy" – or any other trading strategy – in selecting the investment.

45.     Within five weeks, Eclipse reported to Eichengreen that it had lost almost $500,000 of the Fund's principal.

46.     Eichengreen did not disclose the $500,000 loss to DFG's internal accountant, falsely informing the accountant that there had been no activity relating to the currency trading investment. As a result, the Fund's February 2004 financial statements did not reflect the Fund's currency trading losses.

47.     Eichengreen reviewed the Fund's February 2004 financial statements which falsely contained the $700,000 valuation of the currency trading investment.

48.     Eichengreen knew that the falsified financial statements would be used to (a) determine the Fund's rate of return, (b) determine DFG's profit-based compensation, and (c) create monthly customer account statements for the Fund's investors.

49.     Due to Eichengreen's efforts to hide the Eclipse loss, the Fund booked a $136,000 (2.74%) gain for February 2004 when, in reality, the Fund lost over $350,000 (over 7%) for the month.

50.     Eichengreen reviewed and approved the Fund's February 2004 customer statements which falsely disclosed a gain for the month.

51.     DFG took its 20% profit-based compensation based on that fake 2.74% gain. DFG, therefore, took fees from the Fund to which it was not entitled.

52.     At the time DFG issued its February 2004 monthly statements to investors, Eichengreen knew or recklessly disregarded that the statements did not reflect the loss the Fund had sustained in the Eclipse Program and that the statements misrepresented the Fund's rate of return.

53.     The misrepresentations regarding the Eclipse trading losses were material. A reasonable investor would have found it important that (a) rather than gaining 2.74% in

February 2004 the Fund had instead lost 7% of its value for the month, and (b) investors

had been charged a profit-based fee to which DFG was not entitled.

54.      In July 2004, after it was clear that the $500,000 was likely gone for good,

Eichengreen tried to erase the currency trading program from the Fund's books, falsely

informing DFG's accountant that the currency trading program should not be treated as a

separate line item but, rather, as part of the Fund's profitable investment in Argyll.  The

Eclipse loss was netted against Argyll's gains and DFG's accountant simply removed the

currency trading program from the Fund's balance sheet.

55.      Eichengreen and DFG never informed the Fund's investors or its outside

auditor that the Fund had suffered massive losses in an unauthorized currency trading

scheme.

56.      DFG completed the cover-up by withholding documents from the

Commission's exam staff during a September 2005 examination and by deleting critical

electronic documents relating to the currency trading program.

### ATI's Fraudulent Trading Program

57.      On or before March 1, 2005, David Myatt approached DFG with an

investment opportunity.

58.      Myatt represented to DFG that he was the trustee for the "Dalemy Trust"

and an associate with American Trade Industries, Inc.  He claimed that the Dalemy Trust

and ATI held over $60 million in assets which he used to "assist the global financial

markets and social well-being of others."

59.      Those representations were false.  In reality, Myatt knew or recklessly

disregarded that (a) ATI and the Dalemy Trust had no assets, and (b) Myatt had never

managed any investments on behalf of either entity or used any trading profits for
humanitarian causes.

60.     Myatt told DFG that ATI's President, Richard Warren, ran a trading
program that transacted in certain unidentified discounted fixed income instruments.
Myatt represented that Warren would conduct the trades, claiming that Warren was able
to purchase the unidentified instruments at a discount and then resell them at a substantial
profit.

61.     Myatt represented that DFG would likely earn a return in excess of 10%
per month.

62.     Myatt also represented that DFG's invested principal would not be at risk,
and that DFG would retain control over the invested assets.

63.     Myatt represented further that (a) the trading market underlying the ATI
Program was overseen by "the Fed," (b) Warren was one of the few traders licensed by
"the Fed" to trade on that market, (c) the trading system was confidential, and (d) a
portion of the profits generated by the ATI Program would be used to fund humanitarian
and charitable projects around the world.

64.     All of Myatt's representations regarding the ATI Program were false when
made. The ATI Trading Program promoted by Myatt was a sham designed to defraud
investors. No trades ever took place and no profits were actually generated.

65.     In reality, the program described by Myatt was a "Prime Bank" scheme, in
which promoters represent that they can make exorbitant guaranteed returns, with no risk
to the investor's principal, by complex trading in an exclusive (and often secret) market
in unspecified (and, in reality, non-existent) bank instruments. Promoters typically

represent that the trading program is supported by a government entity or an established financial institution and that a certain percentage of profits will be diverted to support humanitarian causes. The ATI Program, and programs like it, are designed so that the promoters can gain control over the investor's assets and divert them for their own personal use.

66.     Such "Prime Bank" programs are entirely fictional. Moreover, the Federal Reserve does not oversee any such trading programs or license any individuals to conduct such trading.

67.     At the time he made those misrepresentations to DFG regarding the ATI Program, Myatt knew or recklessly disregarded the facts contained in paragraphs 64-66 above.

68.     Myatt's misrepresentations in paragraphs 58 and 60-63 were material. A reasonable investor would consider it important that (a) Myatt did not have the credentials that he claimed, and (b) the ATI Program was a sham.

### DFG's Investment in
### the Fraudulent Trading Program

69.     Based, in part, on Myatt's material misrepresentations, DFG agreed to invest $20 million of the Fund's assets (then 98% of the Fund's total assets) in the ATI Program. Eichengreen did not disclose to the Fund's investors (or prospective investors) that DFG had invested almost all of the Fund's assets in a secret trading program that did not fall within the Fund's permitted investments and had relinquished trading authority to individuals with no established track record. To the contrary, DFG and Eichengreen continued to distribute Offering Memoranda that falsely stated that DFG used the Beta Strategy and would employ traders with proven track records in that strategy.

14

## DFG's Profit Sharing Agreement With Myatt

70.     Upon committing the Fund's assets, DFG agreed to split the profits from the Fund's investment with Myatt so that DFG would receive 75% of anticipated profits and Myatt would receive 25% of any profits.

71.     Although he knew of the side profit-sharing agreement, Eichengreen did not inform investors or prospective investors that the Fund's management planned to charge a 25% profit-based fee for Myatt on top of the fees disclosed in the Memorandum. Rather, Eichengreen continued to distribute Memoranda stating that investors would be charged only DFG's 20% profit-based fee.

## DFG Loses Control Over the Fund's Assets

72.     Once Warren and Myatt convinced DFG to invest, they completed the fraud with a three-step scheme to take control of the Fund's assets.

73.     First, Myatt instructed Eichengreen and DFG that trading could not begin until they removed the assets from the Fund's account and placed it in an account under the name of a new corporate entity, Akela Capital, Inc. ("Akela"), which was separate from the Fund.  After obtaining DFG's approval, Myatt incorporated Akela on March 24, 2005.  DFG then deposited $20 million in Aklea's account.

74.     Second, after DFG moved the investment into Akela's account, Warren and Myatt convinced DFG to relocate the $20 million investment to a bank in Italy, telling DFG that ATI's trading clients preferred to deal with banks that operate "in the European way."  Vaughn claims that she was told that she would retain sole control over Akela's Italian account.  Based on Myatt's representations, DFG added $5 million of the Fund's assets to the investment in the ATI Program.

75.    Finally, in June 2005, Warren and Myatt seized control of the Fund's assets by convincing DFG to transfer authority over Akela's account to one of their associates, an Italian resident named Bino Giovanni Hogan.

76.    In August 2005, Hogan completed the fraud by disbursing the remaining balance of the Fund's account to other accounts under the promoters' control.

77.    On September 26, 2005, DFG requested an account statement from Warren and, ultimately, demanded the return of the Fund's Assets.

78.    From September 26, 2005 forward, Warren and Myatt repeatedly represented that an account statement showing trading profits would be provided to DFG and invented myriad excuses for their failure to return the Fund's assets.  At various times, Myatt told DFG that ATI could not return the assets because Warren (a) was on a business trip in Hong Kong, (b) was in the process of moving to Virginia, (c) had not set up long distance telephone service, (d) could not withdraw the investment unless an investor was found to take DFG's place, (e) could not contact the bank because of the November 1, All-Saints Day holiday, and (f) could not withdraw the assets without the approval of the "Fed Administrator."

**The Commission's Examination and the Defendants' Concealment of Their Fraud**

79.    On September 19, 2005, examination staff from the Commission's Chicago Regional Office ("CHRO") informed DFG that the CHRO would be conducting an exam of DFG.

80.    On September 20, 2005, CHRO exam staff began the examination. CHRO staff conducted field work for the examination at DFG through September 23, 2005.

81.     During their field work at DFG, CHRO exam staff discovered the Fund's ATI Program investment. CHRO staff questioned Vaughn and Eichengreen about the ATI Program and requested that DFG provide them with documents related to the ATI Program.

82.     At all times relevant to this Complaint, DFG was required – pursuant to Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 CFR § 275.204-2] – to (a) make and keep true and accurate copies of various categories of books and records, including all written agreements relating to DFG's investment adviser business, (b) provide such records to the Commission upon reasonable request, and (c) make such records available to examination by Commission representatives.

83.     After learning that CHRO examination staff would be requesting documents from DFG related to the Fund's investments, DFG and Myatt created fake, backdated versions of Akela's incorporation documents which hid Myatt's interest in profits earned on the Fund's investment.

84.     Eichengreen helped DFG and Myatt create the backdated incorporation documents, notarizing Vaughn's signature and falsely certifying that the document was signed in March 2005.

85.     The original documents, signed by Vaughn and notarized by Eichengreen, (a) described Akela's purpose as to "act and operate as a Corporation that develops environmental and humanitarian projects, to promote social welfare while reducing unemployment through economic development," and (b) disclosed that Vaughn and Myatt each owned 50% of Akela and were each entitled to 50% of Akela's profits.

86.     The altered versions, also signed by Vaughn and notarized by Eichengreen, (a) deleted the descriptions of Akela's purpose along with any reference to a stock or profit sharing agreement with Myatt and (b) were backdated to March 24, 2005 to make it appear that they were the originals.

87.     Eichengreen substantially assisted DFG in creating the falsified incorporation materials by backdating and notarizing the forged documents.

88.     Eichengreen knew that DFG's conduct was improper.  He knew that his notary certification was false, that the documents were being backdated in anticipation of a Commission examination, and that the documents had been created to hide Myatt's interest in Akela.

89.     Myatt and DFG also created fake correspondence and a phony advisory agreement to disguise the nature of their business relationship.

90.     DFG produced the fake documents to the Commission and withheld other documents that evidenced the profit sharing agreement between DFG and Myatt.

91.     Myatt substantially assisted DFG in creating the forged documents.

92.     Myatt knew that DFG's conduct was improper.  He knew that DFG planned to produce the altered documents to the CHRO's exam staff to prevent them from learning of DFG's profit sharing agreements with Myatt.

93.     Myatt has admitted this misconduct in pleading guilty to obstruction of justice, 18 U.S.C. §§ 1519 and 2, in the related criminal case U.S. v. Warren, et al.

**The Return of the Fund's Assets**

94.     On November 10, 2005, the U.S. Attorney's Office for the Northern District of Illinois filed a criminal complaint alleging, among other things, that Myatt and

Warren had committed wire fraud in connection with this matter.  On November 12, 2005, Myatt and Warren were arrested by federal law enforcement authorities.

95.     Two days after the arrests, Bino Giovanni Hogan wired $21.6 million to Akela's American account, claiming that the payment was a return of principal that had been sitting in Akela's overseas account.  Those assets, along with other assets in the Fund's accounts, have been returned to the Fund's investors.  The Fund is no longer operational.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### (Against Eichengreen)

96.     Paragraphs 1 through 95 are realleged and incorporated by reference as though fully set forth herein.

97.     By engaging in the conduct described in Paragraphs 18-42 above, Eichengreen, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has employed devices, schemes and artifices to defraud.

98.     Eichengreen intentionally or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

99.     By reason of the foregoing, Eichengreen violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Eichengreen)

100.     Paragraphs 1-95 are realleged and incorporated by reference as though fully set forth herein.

101.     By engaging in the conduct described in paragraphs 18-42 above, Eichengreen, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

  a.  obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

  b.  engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

102.     Eichengreen made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

103.     By reason of the foregoing, Eichengreen and violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5
### (Against Eichengreen)

104.     Paragraphs 1-95 are realleged and incorporated by reference.

105.     As more fully described in paragraphs 18-42 above, Eichengreen, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

106.     Eichengreen knew or recklessly disregarded the facts and circumstances described in paragraphs 18-42 above.

107.     By reason of the foregoing, Eichengreen violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT IV

### Violations of Section 17(a)(1) of the Securities Act
### (Against Myatt)

108.     Paragraphs 1-95 are realleged and incorporated by reference as though fully set forth herein.

109.     By engaging in the conduct described in Paragraphs 57-68 above, Myatt, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has employed devices, schemes and artifices to defraud.

110.     Myatt intentionally or recklessly made the untrue statements and

omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and

courses of business described above.

111.     By reason of the foregoing, Myatt violated Section 17(a)(1) of the

Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V

### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Myatt)

112.     Paragraphs 1-95 are realleged and incorporated by reference as though

fully set forth herein.

113.     By engaging in the conduct described in paragraphs 57-68 above, Myatt,

in the offer and sale of securities, by the use of the means and instruments of

transportation or communication in interstate commerce or by use of the mails, directly or

indirectly:

    a.  obtained money or property by means of untrue statements of material fact

        or by omitting to state material facts necessary in order to make the

        statements made, in light of the circumstances under which they were

        made, not misleading; and

    b.  engaged in transactions, practices, or courses of business that operated or

        would operate as a fraud or deceit upon the purchasers of such securities.

114.     Myatt made the untrue statements and omissions of material fact and

engaged in the devices, schemes, artifices, transactions, acts, practices and courses of

business described above.

115.     By reason of the foregoing, Myatt violated Sections 17(a)(2) and (3) of the

Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT VI

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5
### (Against Myatt)

116.     Paragraphs 1-95 are realleged and incorporated by reference.

117.     As more fully described in paragraphs 57-68 above, Myatt, in connection

with the purchase and sale of securities, by the use of the means and instrumentalities of

interstate commerce and by the use of the mails, directly and indirectly: used and

employed devices, schemes and artifices to defraud; made untrue statements of material

fact and omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and engaged in

acts, practices and courses of business which operated or would have operated as a fraud

and deceit upon purchasers and sellers and prospective purchasers and sellers of

securities.

118.     Myatt knew or recklessly disregarded the facts and circumstances

described in paragraphs 57-68 above.

119.     By reason of the foregoing, Myatt violated Section 10(b) of the Exchange

Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT VII

### Aiding and Abetting DFG's Violations of Advisers Act Sections 206(1) and 206(2)
### (Against Eichengreen)

120.     Paragraphs 1-95 are realleged and incorporated by reference.

121.    At all times relevant to this Complaint, DFG acted as investment adviser to the Fund.

122.    At all times relevant to this Complaint, DFG acted as investment adviser to several individual investment adviser clients who invested in the Fund.

123.    As more fully described in paragraphs 18 through 56 above, at all times alleged in this Complaint, DFG, while acting as an investment adviser, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly: (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.

124.    As described in paragraphs 43-56 above, DFG defrauded the Fund by altering the Fund's financial records to hide losses it suffered in the Eclipse investment, artificially inflating the Fund's profit results, and thereby taking management fees from the Fund to which DFG was not entitled.

125.    As described in paragraphs 18-56 above, DFG defrauded its individual investment adviser clients who invested in the Fund by making material misrepresentations to those individual clients directly in the course of the advisory relationship, including (a) misrepresenting the Fund's trading strategy and investments, (b) sending its clients falsified statements hiding massive losses in the Eclipse currency trading scheme, and (c) lying to its clients about the nature and status of their investments.

126.    By reason of the foregoing, DFG violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

127.     As more fully described in paragraphs 18-56 above, Eichengreen knowingly and substantially aided and abetted DFG's violations of Section 206(1) and 206(2) of the Advisers Act.

## COUNT VIII

**Aiding and Abetting DFG's Violations of Advisers Act Section 204
and Rule 204-2 Thereunder
(Against Eichengreen and Myatt)**

128.     Paragraphs 1 through 95 are realleged and incorporated by reference.

129.     As set forth more fully above in paragraphs 79-93, DFG violated Section 204 of the Advisers Act and Rule 204-2 thereunder, by falsifying copies of its records, providing those falsified documents to the Commission's exam staff, and withholding documents from the Commission's exam staff.

130.     By engaging in the conduct described in paragraphs 84 through 88, Eichengreen knowingly and substantially aided and abetted DFG's violations of Section 204 of the Advisers Act and Rule 204-2 thereunder.

131.     By engaging in the conduct described in paragraphs 83 and 89 through 93, Eichengreen knowingly and substantially aided and abetted DFG's violations of Section 204 of the Advisers Act and Rule 204-2 thereunder.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

A.     Find that Eichengreen and Myatt committed the violations alleged above;

B.     Enter an Order permanently restraining and enjoining Eichengreen and Myatt from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder;

C.      Enter an Order permanently restraining and enjoining Eichengreen and Myatt

from aiding and abetting any violations of Section 204 of the Advisers Act [15 U.S.C. §§

80b-4] and Rule 204-2 thereunder [17 CFR § 275.204-2];

D.      Enter an Order permanently restraining and enjoining Eichengreen from aiding

and abetting any violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C.

§§ 80b-6(1) and 80b-6(2)];

E.      Enter an Order, pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-

9(e)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)], requiring Eichengreen and Myatt to pay a civil

penalty; and

F.      Grant such other and additional relief as this Court deems just and proper.


Respectfully submitted,


_____


Dated: September  29, 2008            Timothy S. Leiman (IL #6270153)
                                        leimant@sec.gov
                                      Linda T. Ieleja (IL #6204334)
                                        gerstmanl@sec.gov
                                      Paul A. Montoya (IL #6229890)
                                        montoyap@sec.gov
                                      Attorneys for Plaintiff
                                      United States Securities and
                                      Exchange Commission
                                      175 West Jackson Blvd., Suite 900
                                      Chicago, IL 60604
                                      (312) 353-7390